JAMES R. MORIARTY (SBN: 14459000)
jim@moriarty.com
MORIARTY SKIVER, PLLC
4119 Montrose Boulevard, Suite 250
Houston, TX 77006
Telephone: (713) 528-0700
Facsimile: (713) 528-1390

RYAN SKIVER (SBN: 239610)
rskiver@skiverlawfirm.com
MORIARTY SKIVER, PLLC
7201 East Camelback Road, Suite 290
Scottsdale, Arizona 85251
Telephone: (480) 626-1667
Facsimile: (480) 482-7285

Attorneys for Plaintiffs
STEVE BELL and CHRISSY BELL, individually and as next friends of G.B.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| STEVE BELL and CHRISSY BELL, Individually and as Next Friends of G.B.<br><br>Plaintiffs,<br><br>v.<br><br>MONTEREY BAY MILITARY HOUSING, LLC; CLARK PINNACLE MONTEREY BAY, LLC; CLARK REALTY CAPITAL, LLC; PINNACLE MONTEREY, LLC; MICHAELS MANAGEMENT SERVICES, INC.;  and DOES 1 through 20, Inclusive, Defendants. | Case No.: 5:21-cv-04535<br><br>**ORIGINAL COMPLAINT FOR:**<br><br>1. **COMMON LAW FRAUD**<br>2. **DECEPTIVE TRADE PRACTICES**<br>3. **BREACH OF CONTRACT**<br>4. **NEGLIGENCE; NEGLIGENT MISREPRESENTATION; GROSS NEGLIGENCE**<br>5. **BREACH OF IMPLIED WARRANTY OF HABITABILITY AND OF GOOD AND WORKMANLIKE REPAIRS**<br>6. **THIRD-PARTY BENEFICIARY OF CONTRACT**<br>7. **NUISANCE**<br><br>**JURY TRIAL DEMANDED** |

{00530325}                                  1
**COMPLAINT**

Plaintiffs Steve Bell and Chrissy Bell, Individually and as Next Friends of G.B., file this Original Petition and Demand for Jury Trial against the Monterey Bay Military Housing, LLC, Clark Pinnacle Monterrey Bay LLC, Clark Realty Capital, LLC, Pinnacle Monterey LLC, Michaels Management Services Inc., and DOES 1 through 20 (the "Landlord Companies") and allege as follows:

## NATURE OF THE ACTION

1.      This lawsuit is brought by members of the United States Military (with their families) who leased military housing from the Landlord Companies at The Parks at Monterey Bay (the "Military Installation(s)").

2.      As further described below, the Landlord Companies are large, revenue-rich housing companies that were awarded contracts by the federal government to provide quality living arrangements for U.S. service members and their families.  They receive vast amounts of taxpayer revenue and turn massive profits in purporting to do so.

3.      Instead of providing satisfactory housing, the Landlord Companies have for many years concealed harmful housing conditions from unsuspecting military personnel and their families.  The personnel who lease the housing units effectively give up the full amount of their Basic Allowance for Housing ("BAH") only to be placed in housing replete with deplorable living conditions (including, without limitation, rainwater intrusion; leaking pipes; seeping sewage; excessive moisture; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring and walls; faulty insulation; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical, plumbing and HVAC systems; and other unacceptable departures from applicable building and housing codes).  In the process, many such military personnel, their spouses, and their children suffer from resulting medical issues such as difficulty breathing, asthma, bronchitis, serious allergic reactions, nose bleeds, and

**COMPLAINT**

gastrointestinal issues.  As they observe their families get sicker and sicker and realize the Landlord Companies take no action or grossly inadequate action, they suffer severe and ongoing mental anguish.

4.      When problems with the housing begin arising at points in time after the residents move-in to the units, the Landlord Companies ignore their residents' complaints or provide only token repairs to cover up the extent of the dilapidation.  Thus, the service personnel and their families find themselves in a time-consuming and taxing cycle in which they: (1) must wait on the Landlord Companies to slowly perform maintenance and repairs; (2) come to falsely believe the issues are resolved; and (3) then later discover the issues are not resolved.  All the while, the service personnel and their families suffer the consequences of their contaminated and appalling surroundings.

5.      The Landlord Companies routinely over-promise and under-deliver in their responses to their residents and benefit from the fact that in many instances, they falsely appear to act as if they are the Department of Defense or are under the immediate direction of the Department of Defense.  Thus, military personnel and their families trust the Landlord Companies, the Landlord Companies know it, and the Landlord Companies take full advantage by maximizing their profit to the detriment of the military families they have been entrusted by the government to properly care for.

6.      Plaintiffs (collectively referred to as "Servicemembers" or "Servicemember Plaintiffs") in this case assert various claims, including without limitation claims for statutory fraud and common law fraud; deceptive trade practices; breach of contract; negligence and gross negligence; negligent misrepresentation; breaches of the implied warranty of habitability and the implied warranty of good and workmanlike repairs; third-party beneficiary of contract; and nuisance.

7.      By this lawsuit, the Servicemembers seek to hold the Landlord Companies liable for their false promises, atrocious living conditions, personal injuries, and property damage caused by their profound neglect, malfeasance, and greed.

## THE PARTIES

8.      The Servicemember Plaintiffs are military families that lived in or currently live in privatized housing at the Military Installation(s).

9.      Defendant Monterey Bay Military Housing, LLC is a Delaware limited liability company doing business in Monterey County, California, which may be served by serving its registered agent, CSC-Lawyers Incorporating Service.

10.     Defendant Clark Pinnacle Monterey Bay LLC is a foreign limited liability company doing business in Monterey County, California, which is the managing member of Monterey Bay Military Housing, LLC, and which may be served by serving CSC-Lawyers Incorporating Service, which is the registered agent for Monterey Bay Military Housing, LLC.

11.     Defendant Clark Realty Capital, LLC is a foreign limited liability company doing business in Monterey County, California, which is a manager of Clark Pinnacle Monterey Bay LLC, which is the managing member of Monterey Bay Military Housing, LLC, and which may be served by serving CSC-Lawyers Incorporating Service, which is the registered agent for Monterey Bay Military Housing, LLC.

12.     Defendant Pinnacle Monterey LLC is a foreign limited liability company doing business in Monterey County, California, which is a manager of Clark Pinnacle Monterey Bay LLC, which is the managing member of Monterey Bay Military Housing, LLC, and which may be served by serving CSC-Lawyers Incorporating Service, which is the registered agent for Monterey Bay Military Housing, LLC.

13.     Defendant Michaels Management Services Inc. is a New Jersey corporation doing business in Monterey County, California, which may be served by serving its registered agent, National Registered Agents Inc.

14.     The Landlord Companies are each joint tortfeasors, agents of the others, joint venturers, and/or engaged in the joint enterprise of leasing military housing at the Military Installation(s), as well as engaged in the conduct and acts and/or omissions alleged herein.  At all times relevant herein, there has existed a unity of interest and ownership among the Landlord Companies, their predecessors, agents, parents and/or subsidiaries, such that any individuality and/or separateness among them has ceased, and each such entity is the alter ego of each other entity.

15.     The Landlord Companies are not persons acting under a federal officer.

16.     The true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants designated herein as DOES 1 through 20 pursuant to Code of Civil Procedure section 474 are presently unknown to plaintiffs, who, therefore, sue said defendants by such fictitious names. Plaintiffs are informed and believe, and thereupon allege, that each of the defendants designated herein as a "Doe" is legally responsible in some manner for the events and happenings hereinafter described, and legally caused or contributed to the injuries and damages hereinafter alleged. Plaintiffs will seek leave to amend this complaint to show those parties' true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

17.     This Court has subject-matter jurisdiction and venue is proper before this Court because the Military Installation(s) where the housing at issue is located is within the geographical boundaries of Monterey County.

18.     This Court has personal jurisdiction over the Landlord Companies because the Landlord Companies have committed the acts complained of herein in this State and in this County.

The Landlord Companies have significant contacts with the form such that they are subject to the personal jurisdiction of this Court.

19.     This Court has personal jurisdiction over the Landlord Companies for the additional reason that they have engaged in substantial, systematic, and continuous contacts with this State by, *inter alia*, regularly conducting and soliciting business in this State and this County, deriving substantial revenue from services provided to persons in this State and this County.

## FACTUAL ALLEGATIONS

### The MHPI and the History of Privatized Military Housing

20.     In 1996, Congress established the Military Housing Privatization Initiative ("MHPI") through the 1996 Defense Authorization Act to improve the quality of housing conditions for active-duty military personnel. *See* Pub. L. 104-106, 110 Stat. 186, 544, 10 U.S.C. § 2871 *et seq.* (1996). The MHPI provided military service branches with alternative authorities for construction, renovation, and management of military housing for families and unaccompanied personnel. Under these authorities, the military services can leverage appropriated housing construction funds and government-owned assets to attract private capital and private developers so as to improve the quality of life for military members and their families. This legislation provided a way to maximize use of limited appropriated funds, land, and existing facilities to encourage private sector investment for the benefit of U.S. servicemembers.

21.     Pursuant to the MHPI, the military was encouraged "to stimulate private sector financing of military housing construction and revitalization projects." S. Rep. No. 104-112 (1995).

22.     The MHPI provides the Department of Defense ("DOD") with twelve alternative authorities or tools to achieve its purposes, which include the authorization of direct loans and loan guarantees, differential payments to supplement service members' housing allowances,

**COMPLAINT**

investments such as limited partnerships, stock/bond ownership, and limited liability companies, and the conveyance or lease of military housing units to the contractor.

23.    There are about 80 privatized areas encompassing more than 204,000 housing units located on more than 150 installations. The DOD considers these housing units to be private housing.

24.    Servicemembers who lease housing on a particular military base are required to pay the privatized housing company the full amount of their BAH regardless of the size or condition of the house.  Before the MHPI, housing was provided to military personnel in lieu of the BAH. This change created continuous revenue flow for the life of the management contract and, at least conceptually, requires little additional funding from the government.

25.    The privatized housing companies collect "rent" in the form of BAH payments directly from the DOD, leaving servicemembers, including the Servicemembers named as Plaintiffs in this lawsuit, with no control over their BAH and no leverage against the Landlord Companies when problems arise with their homes.   This disparity in bargaining power is further exacerbated by the fact that the Landlord Companies have a direct line of communication with the military and are keenly aware that a single call to the Servicemembers' chain of command will likely stifle any complaints about their housing. Consequently, the Landlord Companies often prey on Servicemembers' fears of reprisal even when conditions within the rental homes merit no BAH payment whatsoever.

26.    Privatizing U.S. military housing was supposed to *protect* soldiers and their families. The military knew hazards lurked in its housing, and the Landlord Companies likewise were aware of the problems when they took over.  In 2005, for example, the U.S. Army released an environmental study showing 75% of its 90,000 homes nationwide did not meet its own standards of quality or safety. Twenty years after privatization, in 2016, a DOD Inspector General

Report found that poor maintenance and oversight left military families vulnerable to "pervasive" health and safety hazards.

### Rampant Abuses of the MHPI

27.     Beginning in 2018, Reuters published a series of news articles detailing substandard living conditions at U.S. military bases around the country, including lead exposure, vermin infestation, mold, and other contaminants. The reports described how military families encounter high hurdles to resolving disputes in a system that grants vast power to private landlords who manage base housing across the United States.

28.     In November 2018, the investigative arm of Congress launched an inquiry into hazards faced by occupants of housing on U.S. military bases and the oversight of those conditions by the armed services.

29.     On December 3, 2019, a hearing was held before the United States Senate's Armed Services Committee. At the outset of the hearing, Senator Jim Inhofe stated as follows:

> Almost a year ago, **I first heard from military families about the dismal conditions they faced**. Frankly, if confession is good for the soul, Janet Driver called this to my attention from Tinker Air Force Base. And I thought this was something that was just unique to Tinker Air Force Base, and then I thought no. It is elsewhere in Oklahoma. But then it is also **all the way around the country**. And so that was the background of how this all started.

> We have come to learn that **it is a problem nationwide**. It is **a national crisis** of proportions we have not seen since the scandal at Walter Reed about a decade ago.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).[1]

30.     Senator Inhofe further added:

> We continue to hear regularly from the **families across the country** about questionable practices, poor workmanship, and frankly, in some places about **housing contractors just not caring** about the families they are supposed to be serving.

---

[1]  Inhofe's statement can be viewed at https://www.inhofe.senate.gov/newsroom/press-releases/icymi-inhofe-delivers-opening-remarks-at-privatized-military-housing-hearing.

Additionally, as reported in the press, some of these contractors are now under investigation for **defrauding the Federal Government**. I am really worried. What else can come out of the woodwork on this? What else don't we know?

. . . .

Regardless of any potential criminal wrongdoing, we are still **receiving complaints on a daily basis** showing that you are still failing to fix this problem.

*Id.* (emphasis added).

31.     During the same Senate hearing, Elizabeth A. Field, a Director with the Government Accountability Office, testified:

We analyzed over 8 million work order records from all 14 private partners and all 79 projects . . . . we found **anomalies in the data provided by all 14 private partners** such as duplicate work orders and work orders with completion dates prior to when they were submitted.

*See* TESTIMONY BEFORE SENATE ARMED SERVICES COMMITTEE at 14:10-14:20 (emphasis added).[2]

32.     Field then added:

**The problems I detail are significant** . . . . because the Department has been using these metrics to reward and incentivize the private partners.

*See id.* (emphasis added).

33.     Private military housing companies, including the Landlord Companies in this case, upon information and belief manipulated service and repair records to the detriment of residents to drive up profits, including "incentive fees," that could be collected as part of its contract with the government.

34.     On February 6, 2019, Senator Elizabeth Warren opened her own investigation of the MHPI and private military housing landlord companies operating thereunder. In Senate testimony on February 13, 2019, John Ehle, President of Hunt Military Communities, acknowledged Defendants and/or related entities are responsible for the maintenance of the

---

[2] Ms. Fields' testimony is available at https://www.c-span.org/video/?466935-1/privatized-military-housing.

military housing on applicable bases and effectively admitted under oath that they have not met their obligations to ensure the military housing under their charge are safe, clean and habitable. *See, e.g.,* TESTIMONY BEFORE JOINT SUBCOMMITTEE ON PERSONNEL & READINESS AND MANAGEMENT SUPPORT at 2:21:20-2:21:26.[3] The leaders of other housing entities operating under the MHPI echoed the same with respect to their standards and procedures and, as a result, amplified widespread concern about a culture of systemic abuse that appears to be rampant throughout the housing companies operating under the MHPI (including the Landlord Companies named as Defendants herein). *See id.*

35.     The Landlord Companies were tasked with providing quality military housing to U.S. military personnel and their families but, upon information and belief, have operated duplicitously so as to avoid doing so and thereby decrease costs while increasing profits at the expense of U.S. soldiers, their families and children, and the United States taxpayer.

36.     Senator Warren submitted her written report, dated April 30, 2019, which contained four conclusions about the various private housing firms operating under the MHPI, including the Landlord Companies named as Defendants herein: (1) they have set up a complicated web of subcontractors and subsidiaries that undermines accountability for substandard conditions in military housing and makes it difficult to track revenues, profits, and the flow of funds; (2) they have failed to create accessible or centralized records and protocols to address complaints and reports of problems with military housing, which makes comprehensive assessment and oversight of their performance difficult and complicates efforts to improve housing quality; (3) they are making large profits while taking minimal investment risks; and (4) they are receiving sizeable

---

[3] The hearing testimony is available at: https://www.armed-services.senate.gov/hearings/19-02-13-current-condition-of-the-military-housing-privatization-initiative.

incentive fees even when they face substantial quality control challenges.  *See* REPORT OF INVESTIGATION INTO MHPI, Apr. 30, 2019.[4]

37.     Since having ownership of the subject housing units at the Military Installation(s) transferred to them and being delegated maintenance responsibility for the same, the Landlord Companies have systematically undermaintained the units, subjecting the Servicemembers and their families to the above-described atrocious conditions.

38.     In their dealings with the Servicemembers, but for the admissions and acknowledgements in their congressional testimony, the Landlord Companies refuse to acknowledge the severity of the problems and refuse to adequately remedy them.  Instead, they move the families time and time and time again to new units, while assuring the Servicemembers that each unit is in acceptable condition.

39.     As a result, the Servicemembers and their families have fallen ill due to exposure to the mold and other toxins, lost nearly all their personal possessions, and paid their full Basic Allowance got Housing in exchange for woefully substandard facilities.

**The Servicemembers and Their Families Have Suffered Tremendously**

**Steven Bell and Chrissy Bell**

40.     U.S. Navy Lieutenant Commander Steve Bell, his wife Chrissy Bell, and their child, G.B., moved into housing at the Parks at Monterey Bay which was managed and leased by the Landlord Companies in June of 2018.  When the family moved in, the Landlord Companies never informed them of moisture issues or previous mold remediation efforts; instead, representing to the family that they were being leased a safe, habitable house. The rotting structures, pervasive

---

[4] Senator Warren's report is available at:
https://www.warren.senate.gov/imo/media/doc/2019.04.30%20Military%20Housing%20Letter%20to%20Armed%20Services%20Branch%20Chiefs.pdf.

mold, and health issues they suffered as a result of the mold infestation throughout 8029 Shubrick Road haunt them still to this day.

41.     The Bell family noticed the impacts of the mold infestation shortly after moving into the house at 8029 Shubrick Road. A few days after moving into the house, Mrs. Bell and their daughter began to break out into rashes after bathing. Lt. Comm. and Mrs. Bell both began having problems regulating their body temperature and Lt. Comm. Bell developed hands that were so dry that they cracked. He also began suffering from migraines that lasted all day. He previously had no history of migraines. Lt. Comm. Bell's physical stamina and mental acuity also suffered: it took him longer to complete his regular coursework due to inability to focus, and his run time for the mile-and-a-half slowed. He struggled to run half a mile without getting out of breath. He was eventually diagnosed by a pulmonologist with small airway disease. Additionally, after visiting the schools' behavioral health clinic, Lt. Comm. Bell was diagnosed with ADHD and prescribed medication that seemed to help. He previously had no problems focusing on complicated coursework.

42.     Mrs. Bell also experienced issues with her physical stamina. She was a long-distance runner who typically had no problems running 8 to 10 miles at a time. Shortly after moving into the home at 8019 Shubrick Road, she experienced shortness of breath after the simple physical act of climbing the stairs. She also developed migraines like her husband, and also started experiencing a metallic taste in her mouth. In January 2019, the Bells' daughter, who had previously been in the 90th percentile for infant weight and height, was down to the 30th percentile.

43.     The Bells, having noticed problems with the home, requested maintenance records for the 8029 Shubrick Road home as early as May 2018. They were provided with records that were dated only just before they were allotted the home. After the request was made, the Landlord Companies mistakenly provided all maintenance records for every home in the development, the

records for which went back as far as 2017. The only home that did not have older records was the Bells' home. It is difficult to believe that such records did not exist.

44.     In May 2019, Mrs. Bell put in a work order to address condensation she found that collected above the dishwasher and a leak near the bottom of the dishwasher. The Landlord Companies sent someone to look into the area and told Mrs. Bell that they would bring in an outside contractor called CleanTec. On or about May 15, 2019, CleanTec arrived to inspect the home and placed air scrubbers throughout the home. The family noticed that it was easier to breathe within a few days. Just after the CleanTec visit, the Landlord Companies informed the family that they would have to leave the house. The family evacuated with the clothes they were wearing, their medications, and Lt. Comm. Bell's laptop. Soon after they left the home, many of their physical symptoms went away.

45.     Soon after they evacuated the 8029 Shubrick Road house, the Bells were informed that mold was found on the kitchen cabinets, the drywall insulation, under the flooring, along the studs, and throughout the master bathroom. The wax ring around the toilet had failed and the subfloor in the master bathroom was rotted through. Throughout May and June of 2019, the Landlord Companies conducted air testing and allegedly determined that the levels of mold were within acceptable limits. The Bells paid for their own testing which showed concentrations of mold higher than the Landlord Companies' tests. Both tests detected the presence of the following types of mold: chaetomium, aspergillus, stachybotrys, cladsporium, and three other types of mold associated with sinus infections, lung infections, asthma, and hay fever. Mold was detected in high levels in the master bedroom, and even in G.B.'s stuffed animals that she slept with every night.

46.     CleanTec began mold remediation in June of 2019. At the beginning of the remediation, the Bells were reassured by representatives of the Landlord Companies that the home would be secure and that the belongings would be safe at all times. The Landlord Companies also represented that the keys to the home would be with the maintenance staff so that the contractors

would not have keys. The Bells left their baby monitor on, which recorded and captured containment failures, including plastic sheeting becoming unmoored, and contaminated construction materials being left around the house outside of containment areas. On more than one occasion, the video captured workers unsupervised, entering the home using a set of keys with no maintenance worker in sight. The workers would also walk from containment areas to other areas of the house, tracking mold spores throughout uncontaminated areas.

47.     In or about August 2019, the Bell family met with representatives from the Landlord Companies and CleanTec to discuss the mold remediation. The CleanTec representative presented the mold remediation report to the Landlord Companies' representative. The Bells requested a copy of the report but were not provided a copy until almost two weeks after the meeting.

48.     In or about November 2019, after the family had been living out of a hotel for several months, Lt. Comm. Bell went into the home and noticed evidence of previous mold remediation efforts, including encapsulate paint covering the studs, which is common in mold remediation treatment. Eventually, the Landlord Companies admitted that the house had experienced moisture problems ever since it was constructed in 2007. Essentially, the Bells learned that a leak developed shortly after construction of the home that was never properly addressed or repaired, which in turn led to pervasive mold problems and structural rotting.

49.     As a result of the presence of mold, the family's household goods, including irreplaceable personal items, were ruined.  An attempt to remediate their possessions failed, which damaged the child's mental health.  The family, who was forced to discard most of their personal possessions, continues to try to replace what they can.

50.     As a result of living in housing managed by the Landlord Companies, the Bell family permanently lost many of their personal possessions and will continue to suffer health issues associated with exposure to mold and other airborne toxins. The deplorable conditions also

caused them to suffer mental distress from living in an unhealthy environment, worrying about their child, and dealing with a derelict landlord that consistently failed to address issues that materially affected their health and safety.  The family paid handsomely for the privilege, paying their monthly BAH to the Landlord Companies the entire time they were living in this squalor.

### The Underlying Contracts, Military Services' Standards, and Servicemember Leases

51.     Congress designed the MHPI to "substantially upgrade military housing on an accelerated basis" through the utilization of new "authorities" that permit the military to offer certain cost-saving and money earning benefits to private entities in return for their provision of housing and related services to military personnel.  *See* 141 Cong. Rec. S18853 (noting the MHPI provides "new authorities for the provision of new housing, repaired housing, [and] restored housing for our military personnel.").

52.     According to the website for the Office of the Assistant Secretary of Defense for Sustainment, Congress established the MHPI "as a tool to help the military improve the quality of life for its servicemembers by improving the condition of their housing."[5]

53.     After the MHPI was enacted into law, the United States of America—to accomplish its admirable goals related to the improvement and management of military housing—entered into a ground lease and various other contracts (the "Underlying Contracts") binding the Landlord Companies for the design, development, management, operation, maintenance, renovation and rehabilitation of housing units for military personnel and their families at the Military Installation(s).[6]

---

[5] *See* Office of the Assistant Secretary of Defense for Sustainment, Facilities Management–Military Housing Privatization Initiative, available at:
https://www.acq.osd.mil/eie/FIM/Housing/Housing_index.html.

[6] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

**COMPLAINT**

54.     Accordingly, military personnel such as the Servicemember Plaintiffs in this lawsuit were intended beneficiaries of the MHPI and the Underlying Contracts which served as the primary vehicle for implementation of the MHPI.  The MHPI and the Underlying Contracts were created for the express purpose of improving military housing for military personnel and their families including the Servicemember Plaintiffs in this lawsuit.

55.     As a result of the Underlying Contracts binding the lessee signatories, their sublessees, assignees, transferees, successors and/or their duly authorized representatives, and the like, the Landlord Companies placed themselves in such a relationship with the Servicemembers that the law imposes an obligation upon the Landlord Companies to act in such a way that the Servicemember Plaintiffs in this lawsuit would not be injured as a result of leasing the privatized housing units.

56.     The Underlying Contracts require compliance with applicable state laws.  As revealed by congressional testimony in December of 2019 by Elizabeth A. Field, a Director with the Government Accountability Office, the Landlord Companies must "comply with all federal, state, and local environmental health and safety codes. . . . [T]hat requirement is in all of the contracts."[7]

57.     Moreover, the Underlying Contracts, upon information and belief, require management and maintenance of the military housing consistent with the standards of a market rate residential rental development in the surrounding area.  This is to include maintenance and repair in accordance with military, federal, state and local codes to ensure all of the houses are at all times maintained in a reasonably acceptable fashion.

---

[7] *See* Transcript of December 3, 2019 Hearing Before the Committee on Armed Services of the United States Senate, available at https://www.armed-services.senate.gov/imo/media/doc/19-77_12-03-19.pdf, at p. 89:7-10.

**COMPLAINT**

58.     In addition, all new construction and major renovations at military housing projects must be completed in accordance with local building codes and standards.

59.     And the military services have adopted their own standards applying to the condition and maintenance of privatized housing.  Compliance with the standards is generally mandatory.

60.     For example, Army Pamphlet 420-1-1 identifies standards intended to maintain housing to prevent its deterioration including, without limitation, as follows:  roofing is required to be weather-tight and free of corrosion and abnormal deterioration of individual components, and replacement is required for missing pieces to preserve the original whole condition of the roof system; items which pierce the roofing must function as originally designed; flashing must prevent leaks as originally intended; interior walls must be free of damage, deterioration, cracks or defective materials; subflooring and related structural members must be safe and usable; deteriorated subflooring must be repaired or replaced to retain the original condition of the floor; and interior trim must be smooth and free of chipped and peeling paint.[8]

61.     Similarly, pursuant to the Air Force Guidance Memorandum AFI32-6001, maintenance and repair must be performed according to accepted engineering practices and repairs to defective, broken, damaged or malfunctioning conditions must be performed timely and adequately, including without limitation interior painting; minor floor and wall repairs; restoring ceiling and wall finishes; electrical and plumbing fixture repairs; restoration or replacement of flooring and roofing systems as needed; repair of exterior walls and structures; repair of interior partitions; repair of electrical, plumbing, heating ventilations and air conditioning; and replacing

---

[8] *See* ARMY PAMPHLET 420-1-1, pp. 49-51, available at:
https://armypubs.army.mil/epubs/DR_pubs/ DR_a/pdf/web/PAM%20420-1-1.pdf.

failed or unserviceable materials, systems or components.[9]   Under the U.S. Air Force Family Housing Guide for Planning, Programming, Design and Construction, lead-based paint must be abated and indoor air pollutants such as mold, asbestos and harmful allergens must be eliminated.[10]

62.    Moreover, the Underlying Contracts, upon information and belief, require the Landlord Companies to manage lead-based paint in accordance with standards set by the military services, and an environmental baseline survey must be prepared before any real property can be sold, leased, transferred or acquired so as to establish a baseline of the environmental condition of the housing and serve as a basis for identifying areas that may be contaminated.  The survey, upon information and belief, includes a lead-based paint survey indicating the presence of lead-based paint in the housing units constructed prior to 1978, and in some instances in the soil surrounding the units which exceeds regulations set by the Environmental Protection Agency ("EPA").  Pursuant to EPA regulations, a soil-lead hazard is present on residential property when concentrations in the soil exceed 400 parts per million in high contact areas for children or 1,200 parts per million of bare soil in the rest of the yard.  And, according to the baseline survey, lead-based paint exists throughout the housing units including without limitation door frames, windowsills, window jambs, and baseboards.  Accordingly, the Landlord Companies possessed records and information, upon information and belief, including the aforementioned environmental survey which identified concerning lead concentrations in the soil surrounding the housing units as well as in the lead-based paint present in the housing units, but did not disclose such information to all tenants as required and have failed to remedy the conditions, thereby exposing the Servicemembers and their families thereto.

---

[9] *See* AIR FORCE GUIDANCE MEMORANDUM AFI32-6001, pp. 57-58, available at:
https://www.wbdg.org/FFC/AF/AFI/afi_32_6001.pdf.

[10] *See* U.S. AIR FORCE FAMILY HOUSING GUIDE FOR PLANNING, PROGRAMMING, DESIGN AND CONSTRUCTION, pp. 211-14, available at:
https://www.wbdg.org/FFC/AF/AFDG/familyhousing.pdf.

**COMPLAINT**

63.     Upon information and belief, the Landlord Companies knew about the unacceptable conditions in the housing when they agreed in the Underlying Contracts to manage the housing and ensure it was made habitable and acceptable for military members and their families to live in the houses.  Moreover, upon information and belief, the Landlord Companies agreed they would not permit occupancy or use of any buildings, including those leased by the Servicemembers, without complying with all applicable federal, state, and local laws and regulations pertaining to lead-based paint and lead-based paint hazards.

64.     The Landlord Companies require Servicemembers to enter into a lease agreement. Under the terms of the lease, Servicemembers' rent is the full BAH, which is deposited directly into the Landlord Companies' accounts. Despite the deplorable conditions described herein, there is no ability for Servicemembers to negotiate the price of the housing.

65.     For a Servicemember moving to a new base upon receiving orders to do so, the main priority is to start the new assignment as expeditiously as possible. This is particularly challenging for servicemembers who serve as part of high operations-tempo units vital to national security or those who need to quickly integrate into pre-deployment training. And for servicemembers relocating across the country or from overseas, there is often little or no time to meaningfully review housing options at the new duty station before arriving on base.

66.     To this point, Senator Tim Kaine remarked on December 3, 2019, during the hearing before the United States Senate's Armed Services Committee:

> But **they treat military tenants like they are captives**, like it is a captive audience. People who move from across the country to a place where they do not know anyone, where they do not know anything about the rental market, where they are trying to find new schools and get accustomed to everything else – there is a natural tendency to want to live on base.  And the occupancy rates will be high because of that tendency.  And **so these companies who would compete hard and try to produce a high quality product in another business** unit of the identical company **treat these folks as if they are captives** and that they do not have to treat them in the same way that they would treat private tenants.  And I find that outrageous.

*See* STATEMENT BEFORE SENATE ARMED SERVICES COMMITTEE (emphasis added).

67.    The lease is made subject to the laws of the State of California, and the Landlord Companies provide Servicemembers with resident guide(s) incorporated into the lease which upon information and belief convey rules and regulations subject to the laws of the State of California.

68.    The Landlord Companies have, upon information and belief, received thousands of complaints and repair requests, including those from the Servicemembers named as Plaintiffs herein, evidencing serious defects which exist throughout the housing units.  The Landlord Companies had actual notice of the unfit and uninhabitable state of leased premises but failed to adequately make repairs.

69.    Instead, upon information and belief, the Landlord Companies made representations to Servicemembers in connection with the lease, including that the houses were structurally sound, had no potential health or safety hazards to residents, and were compatible with contemporary standards of livability. Moreover, upon information and belief, the Landlord Companies advertised that current renovations are compliant with current housing and building codes.

70.    Nevertheless, the fact remains that the Servicemembers' experiences run overwhelmingly contrary to the Landlord Companies' false representations.

### CAUSES OF ACTION

71.    The Servicemembers reallege and incorporate by reference the foregoing paragraphs as though fully stated herein.

### Count 1 – Common Law Fraud

72.    Pleading further, and in the alternative to the extent necessary, the Servicemembers allege common law fraud.  As described herein, the Landlord Companies made multiple material omissions regarding the condition of the houses, and multiple material misrepresentations regarding the habitability of the units. The Landlord Companies also made material representations that repair work would be completed and/or had been completed, and that as a result, the units had

**COMPLAINT**

become habitable and the problems had been resolved. The Landlord Companies were aware that all of their omissions of fact concerning the condition of the units were material when they presented Servicemembers with leases, and the Landlord Companies — because of the ongoing condition issues, repair and remedy of the same problem, and pervasive mold reporting — knew their representations regarding the habitability of the houses were false and/or misleading. Despite knowing the falsity, the Landlord Companies made these representations intentionally or, at the very least, recklessly, as positive assertions and without knowledge of their truth.

73. The Landlord Companies intentionally omitted information and made the foregoing misrepresentations with the intent that Servicemembers would rely on them and enter into leases, and, in fact, Servicemembers did rely thereon to their detriment. The Servicemembers' reliance was justified given their lack of an ability to inspect the houses and given the Landlord Companies' power over the market. This conduct caused injury to the Servicemembers, including but not limited to paying rent for uninhabitable houses, excessive utility bills, environmental testing, moving and storage expenses, expenses for replacement of furniture and other items of personal property, and medical expenses in the past and to be incurred in the future.

74. As a result of the Landlord Companies' conduct, the Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, mental anguish damages, and exemplary damages as Servicemembers' damages arose from the Landlord Companies' fraud and/or malice.

### Count 2 – Deceptive Trade Practices

75. Pleading further, and in the alternative to the extent necessary, the Landlord Companies, in the course of leasing residences to the Servicemembers, committed deceptive trade practices in multiple respects, including without limitation using false, misleading, and deceptive practices, including:

**COMPLAINT**

a.  causing confusion or misunderstanding about affiliation, connection, or association with, or certification by, another;

b.  causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

c.  representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not;

d.  representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

e.  representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

f.  knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service;

g.  representing that a guarantee or warranty confers or involves rights or remedies which it does not have or involve;

h.  representing that work or services have been performed on, or parts replaced in, goods when the work or services were not performed or the parts replaced; and

i.  failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

76.   Specifically, the Landlord Companies, by virtue of their course of administering, leasing, building, and repairing the housing units at issue, were uniquely aware of the condition of the houses, including without limitation the existence of mold, asbestos, rodent and/or insect infestations, and the electrical, plumbing, and HVAC issues associated with the housing units they manage. Nevertheless, the Landlord Companies knowingly and intentionally leased houses to Servicemembers, necessarily and as a matter of fact representing to Servicemembers that the houses were habitable and that appropriate repair and remedy work had been undertaken in the past and would be undertaken in the future.

77.   The Landlord Companies' knowing and intentional representations to Servicemembers were materially false and misleading. Servicemembers relied on the

representations of the Landlord Companies in entering into the leases. However, the Servicemembers have discovered the houses were uninhabitable and not safe for human occupancy and have suffered medical issues as a result of occupying the houses. The Servicemembers have further discovered the Landlord Companies misled them into believing the houses had been properly maintained, and that the repair and remedy work Servicemembers requested during their tenancy was undertaken by qualified professionals and performed in a good and workmanlike manner so as to fully remedy the complained-of issues. Had Servicemembers had an opportunity to properly inspect the houses leased to them and had the Landlord Companies disclosed the true nature of the damage to the houses, none of the Servicemembers would have entered into the respective leases.

78.     The Landlord Companies also misrepresented and caused confusion about the source, sponsorship, approval, and/or certification of goods or services. One way the Landlord Companies did this was through knowingly and intentionally misleading Servicemembers into believing, through their email signature lines, that their own employees are part of the Department of Defense or otherwise overtly affiliated with and/or acting under the immediate direction of the military.

79.     In reality, each of the houses leased to the Servicemembers suffers from such extreme deterioration and mold-related damage and infestation, such that the houses are not safe for human habitation. Mold pervades and grows in the houses. The moisture content of walls contributes to the ever-present moldy conditions, and without repair will only continue to get worse. HVAC systems leak as well and flood the houses. Rodents and insects pervade the walls and, in many cases, the living spaces.  In short, the Landlord Companies knowingly and intentionally leased Servicemembers' houses which were uninhabitable from the inception of the lease and the Landlord Companies subsequently refused to perform reasonable repairs to address the issues and make the houses fit for human habitation.

**COMPLAINT**

80.     Moreover, the Landlord Companies have utilized their relationship with the military, Servicemembers' status within the military, Servicemembers' relatively weaker economic position, the availability (or sometimes lack thereof) of military benefits associated with moving, and the good schools associated with living on military bases to effectively hold Servicemembers hostage in their leases until they received orders stationing them elsewhere. Meanwhile, the Landlord Companies obtained the full amount of Servicemembers' BAH directly from the federal government, giving Servicemembers no discount for the size, quality, or condition of their house, nor for the substandard and deceptive performance of periodic and requested maintenance.

81.     The Landlord Companies' above-described knowing and intentional conduct in subjecting the Servicemembers to uninhabitable living conditions has been and remains a producing cause of economic damages, including without limitation, loss of base housing allowance, damage to personal property, repair bills, excessive utility bills, medical bills, and future medical bills. Moreover, each of the Servicemembers and their family members have suffered mental anguish damages as a result of the Landlord Companies' conduct in knowingly and intentionally placing them in uninhabitable housing units, with such mental anguish many times manifesting itself in physical symptoms associated with the conditions in which the Servicemembers were forced to live. The Servicemembers have also suffered mental anguish through concerns about their family members' wellbeing (as well as their own), their concerns about how and whether they could afford to escape those conditions, concerns about finding suitable housing, concerns about replacing personal property, stress caused by the constant relocation from one temporary residential placement to another, and sorrow over the loss of priceless and/or irreplaceable family heirlooms and records.

82.     As a result of the Landlord Companies' conduct, Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages

incurred in the past, economic damages for medical treatments to be incurred in the future, mental anguish damages, treble damages, and attorneys' fees and costs.

### Count 3 – Breach of Contract

83.     The Servicemembers assert claims against the Landlord Companies for breach of the particular lease agreement ("Lease") to which the Landlord Companies and each of the Servicemembers are parties.

84.     Pursuant to California law, implicit in the Lease and/or as expressly represented therein is the warranty that the Landlord Companies were leasing houses to Servicemembers which were fit for human habitation and not replete with deplorable living conditions (including, without limitation, rainwater intrusion; leaking pipes; seeping sewage; excessive moisture; repulsive rodent and insect infestations; and systemically-poor maintenance) and appalling defects (including, without limitation, the presence of structurally-deficient flooring and walls; faulty insulation; pervasive mold and other toxins; inescapable contamination due to the presence of asbestos and lead-based paint; deficient electrical, plumbing and HVAC systems; and other unacceptable departures from applicable building and housing codes).

85.     To date, the Landlord Companies have failed to comply with the material terms of each Lease by failing to ensure the houses were fit for human habitation and by failing to diligently repair and remedy the conditions affecting habitation at the premises as set forth above in more detail. As such, the Landlord Companies have materially breached their leases with Servicemembers, causing them to suffer actual damages.

86.     Because of the Landlord Companies' breaches, Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and attorneys' fees and costs.

### Count 4 – Negligence, Negligent Misrepresentation, and Gross Negligence

87.     Pleading further, and in the alternative to the extent necessary, Servicemembers allege the Landlord Companies leased homes to Servicemembers with the above-described hazardous and deplorable conditions—but the Landlord Companies never notified the Servicemembers of such conditions.  The Landlord Companies were aware that the houses had such persistent and toxic defects, as prior tenants had made them aware of the hazards on numerous occasions.  After the Servicemembers moved into their homes and ultimately discovered the issues, they complained repeatedly to the Landlord Companies.  But the Landlord Companies refused to act to properly remediate or abate the problems despite knowledge that their failure to act would only exacerbate the problems.  When the Landlord Companies did act, they made only token repairs or permitted only token repairs to be made that did not eradicate the problem, resulting in continuing harm.

88.     The Landlord Companies, as specialized landlords in the business of privatized military housing, owed Servicemembers a duty to notify them of known problems with the housing, provide them with habitable living conditions in the houses leased to them, and to properly maintain and repair the houses to a standard fit for human habitation. The Landlord Companies' conduct fell far below the applicable standard of care owed to the Servicemembers. The Landlord Companies' breaches of their duty include, without limitation, failing to notify the Servicemembers of known hazardous and deplorable conditions, failing to properly evaluate housing conditions to ensure leased properties were fit for human habitation and failing to properly repair and remedy those conditions affecting human health and safety.

89.     Moreover, the Landlord Companies, with specialized knowledge regarding the business of military tenancies and the properties leased to Servicemembers, and with a significant pecuniary interest in leasing houses to military families, falsely represented to Servicemembers that their houses were safe and fit for human habitation and were and would continue to be properly

maintained, without exercising reasonable diligence in ascertaining whether the housing units were habitable and the representations were accurate. Servicemembers, who were neither given a meaningful opportunity to inspect the units leased to them, nor provided with the truth regarding the habitability of those units prior to signing leases on them, justifiably relied on the misrepresentations of the Landlord Companies to their detriment.

90.     The Landlord Companies engaged in the above-described acts and/or omissions with gross negligence, such that their acts or omissions, when viewed objectively from the Landlord Companies' standpoint at the time they occurred, involved an extreme degree of risk considering the probability and magnitude of the potential harm. Further, the Landlord Companies at all times had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of A.D., E.D., and D.D., Next Friends of Louis D'Antonio and Amber D'Antonio, and R.K., L.K., and K.K., Next Friends of Ryan Keller and Samantha Keller, collectively "Minors of Servicemembers" when they knew such acts and/or omissions would clearly and unquestionably result in dangerous health conditions and serious injury to Minors, as well as destruction of their property.  The Landlord Companies' concealment of the persistent and toxic conditions, and then their refusal to remediate the conditions, were among the Landlord Companies' acts and/or omissions which constituted gross negligence.

91.     As a proximate cause of the Landlord Companies' conduct, Minors of Servicemembers have incurred and seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, and exemplary damages for the Landlord Companies' gross negligence.

## Count 5 – Breach of Implied Warranty of Habitability, Breach of
## Implied Warranty of Good and Workmanlike Repairs

92.     Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for breaching the implied warranties of habitability

and good and workmanlike repairs.  Servicemembers have given the Landlord Companies notice of the myriad of issues identified herein associated with the houses each family has leased from the Landlord Companies. Nevertheless, the Landlord Companies knowingly and intentionally failed to repair defects (and/or to make such repairs in a good and workmanlike manner) and to make each house habitable for human occupation. To date, the housing units leased by Servicemembers suffer from pervasive mold and other conditions which materially affect the health and safety of occupants. The Landlord Companies have had adequate time to repair and/or remedy the unsafe and unsanitary conditions after Servicemembers' notices but have knowingly and intentionally failed to make a diligent effort to repair or remedy the conditions after receiving notice from the Servicemembers.

93.    Moreover, unique to the fact that the Landlord Companies are in the business of leasing to members of the military, obtaining rent payments directly from the federal government and providing housing on a base affiliated with good schools, the Landlord Companies have effectively deprived Servicemembers of potential remedies, including, without limitation, withholding rent and performing repairs themselves, or terminating their respective leases and moving to suitable housing. The Landlord Companies hold the Servicemembers hostage—and the Landlord Companies know it.

94.    The Landlord Companies' conduct violates the implied warranty of habitability and the implied warranty of good and workmanlike repairs.  As a result, Servicemembers seek to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future, statutory damages, and attorneys' fees and costs.

## Count 6 – Third-Party Beneficiary of Contract

95.     Pleading further, and in the alternative to the extent necessary, the Servicemembers allege the Landlord Companies are bound by the Underlying Contracts entered into with The United States of America.[11]  The Underlying Contracts constitute valid and enforceable contracts.

96.     The Servicemembers were intended beneficiaries of the Underlying Contracts including, without limitation, requirements in the applicable ground leases that the Landlord Companies ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential lease development in the local area.

97.     The Landlord Companies' obligations which were included in the Underlying Contracts were intended to ensure military personnel such as the Servicemembers named as Plaintiffs in this case (and their families) would be provided with safe and habitable housing while the Landlord Companies operated the housing at issue.  Recognition of the Servicemembers' right to performance is appropriate to effectuate the intention of the Underlying Contracts. Circumstances indicate that the parties to the Underlying Contracts, including the Landlord Companies named as defendants in this lawsuit, intended to benefit military personnel including the Servicemembers.

98.     The Landlord Companies breached the requirements of the Underlying Contracts by engaging in conduct including, but not limited to, failure to ensure professional management and maintenance of the military housing neighborhoods consistent with the standard of a market rate residential rental development in the local area.

---

[11] The Underlying Contracts bind the lessee signatories and also their sublessees, assignees, transferees, successors and/or their duly authorized representatives and the like.

99.     The Landlord Companies also breached the requirements of the Underlying Contracts by engaging in conduct including but not limited to failing to adhere to federal, state and local lead-based paint regulations as required by the Underlying Contracts, and also by failing to comply with requirements in the Underlying Contracts by engaging in the aforesaid particulars.

100.    The Landlord Companies' conduct also breached the duty of good faith and fair dealing implied in the Underlying Contracts.

101.    As a direct, proximate and foreseeable result of the Landlord Companies' breaches of the Underlying Contracts, the Servicemembers, as intended, direct, third-party beneficiaries of such contracts, sustained damages.  They are entitled to recover from the Landlord Companies, jointly and severally, all actual damages, economic damages incurred in the past, economic damages to be incurred in the future.

### Count 7 – Nuisance

102.    Pleading further, and in the alternative to the extent necessary, the Servicemembers assert claims against the Landlord Companies for intentional  nuisance.  As described herein, the Landlord Companies refused to act to maintain houses at the Military Installation(s) with the knowledge that their inaction would result in dangerous living conditions, or that  their inaction was substantially certain to result in dangerous living conditions, thereby interfering   with the Servicemembers' use and enjoyment of their leased homes.

103.    Such interference with the Servicemembers' enjoyment of their homes was substantial,  causing physical damage to their personal property, harm to their health, and psychological harm to their "peace of mind" in the use and enjoyment of their homes.

104.    The effect of such substantial interference in the Servicemembers' enjoyment of their  property was unreasonable. The Landlord Companies created conditions that resulted in offensive  and  intolerable living environments that endangered the Servicemembers' health and property.

105.     As a result of said conduct, the Servicemembers seek to recover from and against the Landlord Companies, jointly and severally, all actual damages, exemplary damages, and costs and fees.

## ACCRUAL OF CLAIMS/DISCOVERY OF INJURIES

106.     Each of the Servicemembers began suffering injuries within the limitations period for all of the claims asserted herein. Specifically, they all began suffering medical conditions and suffered property damage at points in time after they moved into their applicable military housing units.

107.     Further, pleading in the alternative to the extent necessary, all Servicemembers are entitled to tolling of their claims on account of the Landlord Companies' fraudulent concealment. The Servicemembers had to rely on the Landlord Companies to perform maintenance and repairs. After each repair, the Servicemembers reasonably believed (in reliance upon the Landlord Companies' assurances) that the problems were remedied, or that there were no problems at all, when in reality the Landlord Companies had just hidden the problems. Only later did many of the Servicemembers discover that the Landlord Companies' so-called "repairs" were nothing but band-aid measures and that their health and/or property were imperiled.

108.     Further, pleading in the alternative to the extent necessary, the discovery rule tolls Servicemembers' claims. All Servicemembers discovered the extent and true nature of their personal property damage only upon moving out. Thus, accrual of Servicemembers' claims occurred, at earliest, only after: (1) discovery of extent of the mold; (2) symptomatic manifestation of ill health; and (3) discovery of a causal connection between (1) and (2).

**COMPLAINT**

## CONDITIONS PRECEDENT

109.    All conditions precedent to the Servicemembers' recovery have occurred or have been waived, excused, or otherwise satisfied. All required notices have been provided or were waived, excused, or otherwise satisfied.

## ATTORNEY'S FEES & COSTS

110.    Pursuant to all applicable statutory provisions pled herein, and as otherwise allowed at law and/or in equity, the Servicemembers are entitled to recover from the Landlord Companies all of their reasonable and necessary attorneys' fees and expenses incurred in connection with this lawsuit. The Servicemembers are also entitled to recover from the Landlord Companies all costs of court.

## PUNITIVE DAMAGES

111.    Because the injury suffered by the Servicemembers resulted from the fraud, malice, and/or gross negligence of the Landlord Companies, the Servicemembers are entitled to and seek the recovery of punitive damages from the Landlord Companies.

## JOINT LIABILITY

112.    The Landlord Companies are jointly and severally liable to the Servicemembers on all causes of action asserted herein for a multitude of reasons.

113.    First, the Landlord Companies had a meeting of the minds and embarked on a systematic attempt to defraud Servicemembers by making false representations and promises to Servicemembers in order to induce them to lease with the Landlord Companies, without any legitimate expectation that they would provide Servicemembers with a habitable home as promised. The Landlord Companies engaged in one or more unlawful, overt acts to accomplish the actions complained of herein. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

114.     Second, the Landlord Companies are part of a joint enterprise or single business enterprise associated with the rental of houses at military installations in California and are not individually distinguishable. All the Landlord Companies carried on business as a mutual undertaking with a common business or pecuniary purpose and using the same common name, which is featured prominently on Servicemembers' leases and on websites designed for communication between Servicemembers and the Landlord Companies.  The Landlord Companies had an express or implied agreement for a common purpose to be carried out by their enterprise, had a community of pecuniary interest, and each had an equal right to direct and control the enterprise. Therefore, all the Landlord Companies were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

115.     Third,  the Landlord Companies intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act on behalf of one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another.  Specifically, in all or nearly all email communications between Servicemembers and the Landlord Companies, the parties communicating on behalf of the Landlord Companies have signature blocks, among other indications, clearly stated that they were being transmitted by as part of an affiliation/agency with each other. As a result, all the Landlord Companies acted as the agent of the others in the course of the conduct described herein. Therefore, all the Landlord Companies are jointly and severally liable as principals/agents for the claims asserted against each of them.

116.     Fourth,  the Landlord Companies committed the acts complained of herein on behalf of one another and ratified the same. Each of the Landlord Companies approved these acts by word, act, and/or conduct after acquiring full knowledge of these acts, including accepting money from Servicemembers. This approval was given with the intention of giving validity to the

acts. Therefore, all the Landlord Companies are jointly and severally liable for the claims asserted against each of them.

117.    Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All the Landlord Companies aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Servicemembers and to breach their duties as set forth herein. Each of the Landlord Companies did so knowingly and benefitted from such conduct. Therefore, each is jointly and severally liable for the same.

## JURY DEMAND

118.    Plaintiffs demand a trial by jury and tender the jury fee.

## PRAYER

WHEREFORE, premises considered, the Plaintiffs named herein pray that the Court grant them judgment against the Defendants named herein, jointly and severally, on all claims and for all relief sought herein, including but not limited to, judgment for:

a)   Actual damages in the past and future;

b)   Economic damages;

c)   Mental anguish damages;

d)   Statutory damages;

e)   Treble damages;

f)   Punitive damages, as pled for herein;

g)   Reasonable and necessary attorneys' fees and costs of court;

h)   Pre-judgment interest at the highest rate allowed by law;

i)   Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

j)   All writs necessary to effectuate the judgment; and

k) Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Dated: June 11, 2021

MORIARTY SKIVER, PLLC

By: _____

JAMES R. MORIARTY
Attorney for Plaintiffs